UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KEISHA L. LEWIS,                           )
                                           )
                    *Plaintiff*,           )
                                           )
          v.                               )        No. 1:23-cv-01865-JMS-MJD
                                           )
INDIANA DEPARTMENT OF TRANSPORTATION and   )
WILLIAM T. GEIBEL,                         )
                                           )
                    *Defendants*.          )

## ORDER

Plaintiff Keisha Lewis, an African American, formerly worked for Defendant Indiana Department of Transportation ("INDOT"), handling parcels and vouchers for people displaced by highway projects. She has had a kidney transplant, and while working for INDOT, she advocated for an accommodation to work remotely during the COVID-19 pandemic and afterwards. INDOT granted the accommodation. Ms. Lewis was thereafter terminated, following which she filed suit, alleging discrimination and retaliation in violation of the Rehabilitation Act, 29 U.S.C. § 794; 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The Defendants have filed a Motion for Summary Judgment, [Filing No. 49], which is ripe for the Court's consideration.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be

1

coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."  *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).  Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those

facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. "The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment." *Nichols v. Michigan City Plant Plan. Dept.*, 755 F.3d 594, 600 (7th Cir. 2014). Moreover, a party must develop an argument and support it by relevant factual support and legal authority, or the argument is waived. *See United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991) (holding that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").

## II.
### STATEMENT OF FACTS

The following Statement of Facts is set forth pursuant to the standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.    Ms. Lewis's Kidney Condition

Ms. Lewis was born with one kidney and suffered from kidney failure. [Filing No. 50-1 at 23-24.] On October 14, 2008, Ms. Lewis received a kidney transplant. [Filing No. 50-1 at 21.] After the transplant, Ms. Lewis underwent post-operative care, including regular testing and adjustments to her medication for several months, with the frequency of check-ups gradually decreasing over time. [Filing No. 50-1 at 21-22.] She now visits the doctor twice a year "to make sure that [her] levels and blood pressure and everything" else is going well with her health. [Filing No. 50-1 at 22.] To maintain her health, she takes immunosuppressants because her "immune system's been compromised." [Filing No. 50-1 at 22.]

Since having a kidney transplant, high blood pressure is a remaining issue that Ms. Lewis continues to manage.  [Filing No. 50-1 at 23.]  The "higher [her] blood pressure is . . . the higher the risk that [she has] for [her] kidney to fail."  [Filing No. 50-1 at 23.]  She has also had difficulties falling asleep, and when she is able to sleep, she gets only "four or five hours of sleep at night." [Filing No. 50-1 at 27.]  She notes, though, that she does not need to nap during the day, and she believes her sleeping problems have not affected her ability to concentrate.  [Filing No. 50-1 at 28-29.]  Because of her immunosuppressant medication, she has gained weight, a total of seventy pounds.  [Filing No. 50-1 at 25-26.]  This corresponded with her continuing to deal with fatigue. [Filing No. 50-1 at 26.]

### B.    Ms. Lewis Begins Working in the Relocation Department at the INDOT

In December 2014, she began her job at the INDOT in the Division of Real Estate as a "Program Director 2" and was later promoted to Program Director 1.  [Filing No. 50-1 at 17-18; Filing No. 50-1 at 30-31; Filing No. 50-1 at 33.]  Ms. Lewis was the only person working in the Division of Real Estate's relocation department.  [Filing No. 50-1 at 44-45.]  As a Program Director 1, Ms. Lewis was responsible for "administer[ing] state and federal relocation programs statewide for the Indiana Department of Transportation and local governments."  [Filing No. 50-18 at 1.] The job called for Ms. Lewis to be a "[s]ubject [m]atter [e]xpert" regarding the "displacements of persons by state and local highway projects."  [Filing No. 50-18 at 1.]  The job also required Ms. Lewis to "review, approv[e], and process[] . . . all relocation claim vouchers for assistance payments."  [Filing No. 50-18 at 1.]

Ms. Lewis described the practical aspects of her job as "work[ing] active cases for individuals who were displaced [by] road projects."  [Filing No. 50-1 at 35.]  As part of working those cases, Ms. Lewis remained in the office or otherwise off-site and dealt with consultants who would be "out in the field to actually handle more of the displacees" and communicating with the

displaces about "helping them to find housing replacement or . . . helping business owners find replacements for their business locations." [Filing No. 50-1 at 36.] Once the consultants' work was done, they would "submit the paperwork" to Ms. Lewis and her department, which would review and approve their paperwork. [Filing No. 50-1 at 36.] While approving paperwork, Ms. Lewis would "also approve any type of vouchers" that would result in cutting "checks for the displacees" to provide them "money to help them" relocate. [Filing No. 50-1 at 36-37.] Notably, the Program Director 1 job description stated that "[f]ailure to meet deadlines and properly oversee compliance of state and federal laws could result in delays in construction and loss of project funding." [Filing No. 50-18 at 2.]

As of January 2020, Ms. Lewis's overall department head was William T. Geibel, who became Director of Real Estate at INDOT. [Filing No. 50-2 at 6; Filing No. 50-2 at 11.] He "[m]anaged the real estate department and all things associated with real estate and conveyance." [Filing No. 50-2 at 8.] His direct reports included Ms. Julie Foreman, who was Manager of Acquisitions and Relocation. [Filing No. 50-2 at 10.] Director Geibel met Ms. Lewis "shortly after the date [he] started," and continued to see her any day they were both in the office. [Filing No. 50-2 at 11; Filing No. 50-2 at 13.]

Before March 2020, INDOT employees, including Ms. Lewis, worked inside the office's physical location. [Filing No. 50-1 at 51.] At that time, Ms. Lewis's duties included "mailing out" checks to displacees. [Filing No. 50-1 at 80-81.] Then came the COVID-19 pandemic, and employees worked remotely for the next two years. [Filing No. 50-1 at 55.] Ms. Lewis's former supervisor Todd Clift instructed her to take home 150 to 200 physical files of active parcels so she could work on them at home. [Filing No. 50-1 at 203.] Because Ms. Lewis's office mostly worked remotely, members of her office would not typically "be mailing out the checks" to displacees;

instead, "[t]hey would just contact the consultants to come up to the office and pick up their own checks" to disburse to displacees the consultants were in contact with.  [*See* Filing No. 50-1 at 79.] To the extent any checks were mailed out, managers from the relocation team would wait until a large number of checks arrived to mail them out in bulk.  [*See* Filing No. 50-1 at 79-80.]  From March 2020 onward, the INDOT Finance Department was mailing checks.  [Filing No. 50-1 at 82.]

On February 21, 2022, Ms. Lewis's performance appraisal for the prior year "exceed[ed]" her manager's expectations.  [Filing No. 60-1 at 1; Filing No. 60-1 at 14.]  The performance appraisal described how she cleared 1,000 out of 1,075 parcels "for an overall percentage of 93.02%."  [Filing No. 60-1 at 1.]  Mathematically, this would mean that at the time of the performance appraisal, Ms. Lewis had only 75 parcels outstanding, and there is no indication that they were overdue to be processed.  [*See* Filing No. 60-1 at 1.]  By March 2022, Ms. Lewis and her department were working one day a week at the office and then the rest of the week at home. [Filing No. 50-1 at 53.]  In July 2022, Julie Foreman became Ms. Lewis's manager.  [Filing No. 50-1 at 47.]

**C.    Ms. Lewis Seeks an Accommodation to Work from Home**

Starting August 8, 2022, Ms. Lewis began working from home two days a week pursuant to a remote-work agreement as INDOT employees had begun to return to the workplace.  [Filing No. 50-22 at 2.]  On August 15, 2022, Manager Foreman submitted an interim review of Ms. Lewis that described her performance as "on track."  [Filing No. 60-2 at 1; Filing No. 60-2 at 4.]  Ms. Lewis notes, though, that between when Manager Foreman became the supervisor in July and when Manager Foreman administered the interim review in August, they did not work together, did not discuss work product, and had little meaningful interaction.  [Filing No. 50-1 at 57-58 (Ms.

Lewis stating that she saw Manager Foreman "in passing, maybe . . . one or two days a week" and at most said "hi, bye").]

On August 16, 2022, the INDOT Finance Department was relieved of its responsibility to mail checks. [*See* Filing No. 50-1 at 82.] That same day, Finance Operations Manager Deanna Bennett informed Ms. Lewis that she would again be responsible for mailing checks to displacees; the checks would be placed "in [a] locked desk . . . and [were] ready for [her] to pick them up and mail them out." [Filing No. 50-1 at 81.] However, Ms. Lewis had concerns about coming into the office due to her medical condition; she did not always wear a mask, but she did engage in social distancing to "try[] to stay away from people" the "majority of the time." [Filing No. 50-1 at 68.] With limited space in the office, she found it logistically difficult to stay socially distanced away from coworkers, but she "tr[ied] to make it work." [Filing No. 50-1 at 69.] Despite these concerns, she did not know of an option to work more days remotely. [Filing No. 50-1 at 67.] Because Ms. Lewis's daughter contracted COVID, she educated herself about how to follow the State of Indiana's COVID-19 guidelines, which she learned would permit immunocompromised state employees like herself to work remotely, so she applied to work remotely five days a week; as of September 1, 2022, her request was approved. [Filing No. 50-1 at 63-65; Filing No. 50-1 at 82; Filing No. 60-6 at 1.]

This was not a "pleasant surprise" to Manager Foreman, who testified that September 1 was the first time she had heard of Ms. Lewis seeking an accommodation. [Filing No. 50-3 at 58.] This was frustrating to her because she was still learning the scope of her management tasks, so she "wanted to learn more about [Ms. Lewis's] role and responsibilities," but whenever Manager Foreman asked questions, she felt like Ms. Lewis was giving her "the runaround." [Filing No. 50-3 at 59.] Manager Foreman testified that she did not know the medical reason Ms. Lewis was

granted an accommodation, but she did admit that she knew Ms. Lewis had had a kidney transplant.

[Filing No. 50-3 at 111.]

### D.   After Attending a Public Outing, Ms. Lewis Refuses to Help Mail Relocation Checks

According to Director Geibel, "[p]art of the relocation supervisor's responsibility is to make sure that checks get where they need to go," so that they "get disbursed to the relocatees." [Filing No. 50-2 at 43.]  Director Geibel explained that "[t]he checks come from the auditor's office in a physical form," "so they need to be recorded and processed in [the] system and then passed to the appropriate relocation specialist or relocation consultant." [Filing No. 50-2 at 43.]  In October 2020 he had asked Ms. Lewis to come downtown to take care of the checks around "once a week." [Filing No. 50-2 at 43.]  Director Geibel noted that Ms. Lewis was not required to physically come into the office, and that instead, they met Ms. Lewis "down at the loading dock with the checks" "where it was a handoff." [Filing No. 50-2 at 59.]  Director Geibel did this sort of handoff with "a lot of consultants during COVID" and noted that everybody was "masked up" for the handoffs. [Filing No. 50-2 at 59.]

But shortly after receiving approval to work remotely, Ms. Lewis e-mailed Finance Operations Manager Deanna Bennett to assert that she would no longer mail out checks; she acknowledged that "it was previously discussed two weeks ago that [she would] have to resume mailing out the Relo[cation] checks . . . , but effective today, [she was] approved to work remotely from home permanently until COVID is no longer an issue, so [she] hope[d] [Operations Manager Bennett could] understand that [she] will no longer be working in the office to mail out checks." [Filing No. 50-1 at 83; Filing No. 50-1 at 100.]  Ms. Lewis testified that "[n]o one directed" her to send the e-mail; she simply "went ahead" and sent it under the assumption that because she would be working remote, she would not be obligated to mail checks.  [Filing No. 50-1 at 83-84.]

8

On September 16, 2022, Manager Foreman directed Ms. Lewis to continue her role in preparing checks, stating that "[g]oing forward, [Director Geibel] or [she] will meet [Ms. Lewis] outside the building to hand off the checks.  When they are ready to be mailed, then you can return them to us and we will meet you outside to pick up." [Filing No. 50-7 at 3.]  Manager Foreman stated further that "Meeting [Director Geibel] or [herself] is a reasonable request and does not require you to enter the building." [Filing No. 50-3 at 39; Filing No. 50-7 at 3.]  Manager Foreman noted that she would "no longer ask" the Finance Department to "do this job function on [Ms. Lewis's] behalf," because the Finance Department was no longer willing to do the work for Ms. Lewis.  [Filing No. 50-3 at 40; Filing No. 50-7 at 3.]

Finance Operations Manager Bennett declined to have her department keep shouldering these tasks because she discovered via a social media post that Ms. Lewis "had been at a football game, a crowded public place." [Filing No. 50-3 at 54.]  Operations Manager Bennett reasoned that there was a contradiction between Ms. Lewis's assertion that she was "too fragile to come in the building" but she "was not fragile enough to be out in a public setting." [Filing No. 50-3 at 54.]  Operations Manager Bennett reported Ms. Lewis's outing to human resources.  [Filing No. 50-3 at 54.]  Manager Foreman did not raise any opposition to this plan because she considered Operations Manager Bennett to have "a valid point." [Filing No. 50-3 at 54.]  Ms. Lewis later justified attending the football game because she wanted to attend "a High School Homecoming football game where [her] niece attends school to watch [her niece] get crowned as the [f]irst African American Homecoming Queen." [Filing No. 50-3 at 56.]  This did not change Manager Foreman's stance that, in her "personal opinion," that was something that Ms. Lewis should not have done; professionally, though, Manager Foreman said that the incident "would [not] matter" to her.  [Filing No. 50-3 at 57-58.]

Ms. Lewis maintains that she was "disappoint[e]d that [Manager Foreman] want[ed] [her] to come down and stuff an envelope" because she felt that she was volunteering to help other departments, but another department would not help her. [Filing No. 50-1 at 91.] She acknowledged, though, that before COVID-19, it was her job to help mail checks, and as the office was transitioning to in-person work, it again was within her job description to help mail checks. [Filing No. 50-1 at 91.] When Ms. Lewis was again required to help mail checks, she was not required to go into the office building itself. [Filing No. 50-1 at 91.] Instead, she stuffed envelopes in her car and "handed them back to someone to actually mail." [Filing No. 50-1 at 91.] Ms. Lewis took issue with having to do this; she "felt it was discrimination" that she had to come downtown without help despite having a medical condition. [Filing No. 50-1 at 92.]

E.    **Ms. Lewis Unilaterally Refuses to Assist the Finance Department and Questions Arise Regarding Ms. Lewis's Need for an Accommodation to Work Remotely**

Some years prior to Ms. Lewis's dispute about stuffing envelopes, INDOT was "dealing with a project called I-69 that had over 2,000 displaced individuals," each of whom required a voucher to get their relocation checks. [Filing No. 50-1 at 96.] The vouchers needed to reference certain vendor numbers related to the relocation, but the vouchers originally did not have those numbers. [Filing No. 50-1 at 96.] Ms. Lewis testified that she had an idea to gain access to the vendor system so that those vendor numbers would automatically cross-reference the address on the voucher with the associated vendor number so that it would not need to be pulled up manually and individually. [Filing No. 50-1 at 96-97.] Ms. Lewis states that she "volunteered" to execute this idea for the benefit of the Finance Department, whose prior operations manager allegedly said "[t]hat would be a wonderful idea." [Filing No. 50-1 at 97.] Ms. Lewis states that she received "an email thanking [her] for volunteering to assist them." [Filing No. 50-1 at 97.] Ms. Lewis

considered this work to be "taking on that extra responsibility" and that she was "being nice." [Filing No. 50-1 at 98.]

In September 2022, when Ms. Lewis was directed to resume helping to mail the checks, she decided to stop other work that she perceived fell under the purview of the Finance Department. [Filing No. 50-1 at 93.] On September 19, 2022, she wrote an e-mail to Operations Director Geibel and Manager Foreman stating that "for the past 2 years, [she has] volunteered to assist the Finance Department with entering their financial coding on all Relo[cation] vouchers during [her] review process" and that she would "no longer be able to assist the Finance Department" with that task and would "redirect that task back to their section." [Filing No. 50-1 at 93-94.] She also wrote an email to Operations Manager Bennett indicating the same:

> I want to thank the Finance Department for giving me the opportunity to assist your section . . . . It has truly taught me a lot in the process of understanding how the world of Finance works . . . . When I volunteered to help Finance out 2 years ago . . . I seen [sic] how much of a time consuming process it was for Finance and I wanted to help.
>
> But it comes with deep regret that I have to inform you that I am unable to continue volunteering with the Finance section, effectively immediately. I understand how overwhelming it may be to have to take on someone else's tasks, despite helping to assist in their section, which is why I am unable to continue volunteering in that role. Thank you and I wish you continued success.

[Filing No. 50-8 at 2.]

Ms. Lewis reasoned that "if they [were] removing the assistance" in the form of "someone being able to assist [her] on . . . mailing out the checks," then she would "remov[e] [her] assistance" in the form of "help[ing] out" the Finance Department. [Filing No. 50-1 at 99.] Ms. Lewis did not consult Director Geibel or Manager Foreman before sending these emails because she "did [not] think [she] needed to receive instruction" to do so. [Filing No. 50-1 at 94.]

Ms. Lewis states that shortly after sending these emails that same day, she had a conversation with Manager Foreman; during this conversation, Manager Foreman allegedly stated

Ms. Lewis did not have to continue helping the Finance Department "if that's what [the Finance Department] had said." [Filing No. 50-1 at 101.]

Manager Foreman's factual account disputes what was actually discussed during that conversation and what Ms. Lewis was permitted to do: on September 19, 2022, the same day Ms. Lewis wrote the email declining to help the Finance Department, Manager Foreman prepared to have a conversation with Ms. Lewis in response to that email. [Filing No. 60-3 at 2.] Manager Foreman received "talking points" via an email from Regional Human Resources Director Janell Gurney that recommended informing Ms. Lewis that she was insubordinate. [Filing No. 60-3 at 2.] Those talking points also recommended expressing skepticism about Ms. Lewis's need for an accommodation, directing Manager Foreman to state:

> I am holding you accountable to the same standards of duties of your job while you are at home in the same way an employee in the office would be held accountable. Your failure to carry out a job duty I have asked of you is insubordination and will result in disciplinary action; . . .

> [W]e feel strongly that there is a disconnect between the paperwork you submitted to HR from your Doctor and the posts you are sharing on [social media]; these posts were provided by others in the department who shared unsolicited that you appear to not have circumstances that would allow for an accommodation to work full-time remote; effective immediately we need additional documentation to clarify your situation, i.e., what was approved as an accommodation does not align with your activities.

[Filing No. 60-3 at 2.]

That same day, Manager Foreman spoke with Ms. Lewis and emailed back Human Resources Director Gurney to report that she called Ms. Lewis and "stated that [Ms. Lewis] was out of line, [and] that it was considered insubordination for her to 'tell' another manager what she will and will not do. [Ms. Lewis] wanted to debate the definition of insubordination, and contend[ed] that she ha[d] been 'volunteering' for this job task for two years, that it is not a directive." [Filing No. 60-3 at 1.] Manager Foreman ultimately did direct Ms. Lewis to stop her

work helping the Finance Department because there was "another employee who d[id] that [so] there [was] no need for duplicate effort." [Filing No. 60-3 at 1.]  Manager Foreman also brought up the concerns about Ms. Lewis's accommodation to work remotely, raising the "disconnect between active social outings and the need for remote work." [Filing No. 60-3 at 1.]

The State Personnel Department recommended Ms. Lewis do daily one-on-one meetings to keep track of her performance. [Filing No. 50-2 at 47.]  So, also on September 19, 2022, Ms. Lewis began having daily check-in calls with Manager Foreman to monitor her work since she was working remotely. [Filing No. 50-1 at 114-15.]

### F.    Ms. Lewis Submits her First Internal Complaint of Discrimination

On September 19, 2022, Ms. Lewis also emailed Human Resources Director Gurney and another official from the State Personnel Department to report Director Geibel and Manager Foreman for "harassment," "discrimination," and "hostile work environment." [Filing No. 50-1 at 148.]  She "question[ed] the validity of" the request for more medical documentation for her accommodation. [Filing No. 60-5 at 1.]  She asserted that it was inappropriate that she was monitored outside of work:

> [O]utside activities outside of my normal working hours are being questioned as to whether or not I should have the ability to work remotely from home regardless of my medical condition and my compromised immunities . . . [T]his is borderline harassment and/or discrimination due to my medical condition and now being watched outside of office hours to see what I was doing is truly troublesome.

[Filing No. 60-5 at 1-2.] Ms. Lewis considered it discriminatory to be required to drive downtown to stuff checks into envelopes because Manager Foreman "at that time was not willing to ask anyone from another department to help [her] any further" even though she had a medical condition. [Filing No. 50-1 at 148-49.]  Ms. Lewis wrote in the email that she "started receiving harassing phone calls from" Manager Foreman, apparently referencing the call the prior day, during which they discussed her outside activities going to the football game. [Filing No. 50-16

at 1.] Ms. Lewis stated that "this [was] actually not the first time that [she had] gone through this." [Filing No. 50-16 at 1.] She was referring to an instance in 2020 where employees raised concerns that she "was out in public [one] weekend with some of [her] fellow coworkers" and she was disappointed that "a look into a photo could be misinterpreted as since [she] was having fun downtown then [she] should be able to come to work." [Filing No. 50-16 at 6.]

Ms. Lewis states that she had discussed her kidney transplant with both Director Geibel and Manager Foreman. [Filing No. 50-1 at 188.] As for Director Geibel, when he was asked whether he "remember[ed] in 2020 being made aware that Ms. Lewis had had a kidney transplant and that was one reason she wanted to stay remote," he agreed that he was "sure that had been mentioned." [Filing No. 50-2 at 44.] He also recalled that in 2022, when employees in his department were coming back to the office or working a hybrid schedule, the State Personnel Department informed him that Ms. Lewis was granted an accommodation to work from home. [Filing No. 50-2 at 45.] Director Geibel does not recall that any other employee in his department had such a remote work accommodation. [Filing No. 50-2 at 46.] Director Geibel states that Ms. Lewis's accommodation was not inherently a "challenge" to his department's work because they were so flexible. [Filing No. 50-2 at 46.] Director Geibel maintains that if it were up to him, he "would have loved to have told everybody to work remote." [Filing No. 50-2 at 46.] As for Manager Foreman, Ms. Lewis had told Manager Foreman about the kidney transplant years before this case in 2017 or 2018; she had known Manager Foreman before she became Ms. Lewis's supervisor, when she "job shadowed" Manager Foreman's prior role in the INDOT. [Filing No. 50-1 at 189-90.]

Additionally, after suit was filed, Ms. Lewis testified that her internal complaint alleged that this treatment was discrimination on the basis of race, though her emailed complaint did not

mention race.  [Filing No. 50-1 at 149; Filing No. 50-16 at 1 (email).]  Ms. Lewis states that between 2020 and 2022, she was the only African American employee working in the Real Estate Department, though she notes that there were four or five other African American employees who formerly worked there.  [Filing No. 50-1 at 211.]

### G.     Ms. Lewis Is Told She Is Insubordinate

On September 20, 2022, Ms. Lewis heard official word from the Finance Department about her supposed volunteering: Operations Manager Bennett responded to Ms. Lewis's email and stated that contrary to Ms. Lewis's assertion, she was not "volunteering"; rather, the Finance Department asked Ms. Lewis to help because of "all the mistakes" found in Ms. Lewis's vouchers. [Filing No. 50-8 at 1.]  Ms. Lewis's vouchers used the wrong address and reported vendors that were not in the system; Operations Manager Bennett stated that correcting this problem was not time-consuming at all, stating that takes mere "seconds to look up a vendor so [Ms. Lewis could] make sure the addresses and vendor information [were] correct. . . . This is something that needs to be done to make sure homeowners are getting paid in a timely manner." [Filing No. 50-8 at 1.] Ten minutes later, Ms. Lewis replied to Operations Manager Bennett and reiterated that actually, "[her] assistance to Finance was volunteering to help you guys out." [Filing No. 50-8 at 1.]

Later that same day, Manager Foreman emailed Ms. Lewis and indicated that Operations Manager Bennett was actually out of the office the previous day, so Manager Foreman was unable to "confirm [Ms. Lewis's] job duties with" Operations Manager Bennett.  [Filing No. 50-9 at 1.] Manager Foreman reiterated that as "stated yesterday, you [were] out of line to state that you would not be assisting with job duties, as this is not your call" and that Ms. Lewis actually would "continue to perform those tasks" helping the Finance Department.  [Filing No. 50-9 at 1.] Manager Foreman emphasized that Ms. Lewis's "failure to carry out a job duty is insubordination and will result in disciplinary action." [Filing No. 50-9 at 1.]

### H.    Ms. Lewis Is No Longer Required to Mail Checks

On September 27, 2022, Human Resources Manager Gurney emailed Ms. Lewis to confirm that Ms. Lewis did not need to send any more medical information for an accommodation; her accommodation to work remotely was based on the State of Indiana's COVID-19 guidance. [Filing No. 60-6 at 1.] Human Resources Manager Gurney also informed Ms. Lewis that she would "not be responsible for coming downtown to receive the checks for sending out as previously discussed." [Filing No. 60-6 at 1.] Ms. Lewis forwarded this email to Manager Foreman. [*See* Filing No. 50-3 at 62-63.] This was an apparent resolution to part of the first complaint of discrimination. [Filing No. 50-12 at 1 (Ms. Lewis acknowledging the "resol[ution] in regards to the assistance with [her] job where checks were concerned and regards to showing further documentation for [her] ADA accommodation").]

Manager Foreman sent an email back to Director Geibel and Human Resources Manager Gurney that the result "smack[ed] of a double standard, but [she could] only imagine that [the State Personnel Department]" did not want to address this. [Filing No. 50-3 at 62-63.] Manager Foreman found this news "frustrat[ing]" even if the decision was "right" because she felt that Human Resources told her to do one thing, but now they were "walking it back." [Filing No. 50-3 at 61.]

### I.    Ms. Lewis Files Her Second Internal Complaint of Discrimination

On September 29, 2022, Ms. Lewis submitted another complaint of discrimination, this time to State Personnel Department Human Resources Officer Kimberly Gander. [Filing No. 50-1 at 149-51; Filing No. 50-12 at 1.] While her first complaint was only against Director Geibel and Manager Foreman, Ms. Lewis's second complaint referenced Human Resources Director Gurney as well because Ms. Lewis "felt like [Gurney] was violating HIPAA." [Filing No. 50-1 at 148-49.] Ms. Lewis states that Human Resources Director Gurney spoke to Manager Foreman,

who then spoke to Ms. Lewis, and began "to talk about what was on [her] doctor's form." [Filing No. 50-1 at 150.] Ms. Lewis notes that she never provided Manager Foreman with her doctors' notes or ADA accommodation form. [Filing No. 50-1 at 182-84.] Ms. Lewis sent those forms "straight to" Human Resources. [Filing No. 50-1 at 187.] Ms. Lewis stated that she felt the ongoing "harassment" was not addressed. [Filing No. 50-12 at 1.] She stated that human resources officers from the State Personnel Department and the INDOT's decision to "have [her] physician's office produce more information and update [her] ADA accommodation . . . was chalked up to a misunderstanding" but only because Ms. Lewis "forced [her] own investigation." [Filing No. 50-12 at 1.] She stated that learning that someone was sending a screenshot of her at a football game to "prove [she] was outdoors . . . [made] her feel that [her] job [was] not safe with working from home with her medical condition," so she urged the State Personnel Department to "make sure this kind of treatment never happens again to [her] or anyone else that has a medical condition and feel singled out because of it." [Filing No. 50-12 at 2.]

Ms. Lewis again later testified that she considered the discrimination to be based on race, but the second complaint to State Personnel does not mention race. [Filing No. 50-1 at 150; Filing No. 50-12 (email).]

### J.    Ms. Lewis Provides Short Notice that She Is Running Late to Meetings with Manager Foreman

Ms. Lewis agreed that between September 30 and October 13, she was late for two out of three meetings, which were the only meetings scheduled during that time. [Filing No. 50-1 at 111.] The following facts describe one of those meetings: On September 30, 2022, Ms. Lewis and Manager Foreman had a pre-scheduled meeting downtown in the office so that Ms. Lewis could hand over some files to Manager Foreman "to close out in the system." [Filing No. 50-1 at 103; See Filing No. 50-10 at 1.] Either the night before the meeting or the morning of – Ms. Lewis does

17

not recall which – she requested two hours of personal time off because her "daughter was having an awards ceremony at . . . school." [Filing No. 50-1 at 103-04.] Ms. Lewis texted Manager Foreman that she was running late, but "there was no response." [Filing No. 50-1 at 104.] Ms. Lewis testified that "unfortunately, [Manager Foreman] did not have her phone on her to let me let her know I was running late." [Filing No. 50-1 at 107.] When Ms. Lewis arrived at the meeting, she was "20 minutes late." [Filing No. 50-1 at 104.] At the meeting, Ms. Lewis stated that "I'm sorry that we ran late – that I was running late." [Filing No. 50-1 at 104.] Ms. Lewis was asked in her deposition whether "it excuses being late to a meeting with [her] supervisor that [she] notified [Manager Foreman] that [she was] going to be 20 minutes late." [Filing No. 50-1 at 107.] Ms. Lewis responded that "being human," these "things happen." [Filing No. 50-1 at 107.] Ms. Lewis testified that she surmised Manager Foreman was frustrated because she was late but mused that perhaps Manager Foreman's frustration alternatively arose from waiting "to go to lunch"; after all, "anybody that's hungry, sometimes they let their stomach talk for them." [Filing No. 50-1 at 107-08.] Manager Foreman noted that there were other instances beyond these in which Ms. Lewis was late, including one when Ms. Lewis stated she was late because she "almost [ran] out of gas" in her vehicle, even though the meeting was online. [Filing No. 50-3 at 137.]

The following Monday, on October 3, 2022, Ms. Lewis emailed Manager Foreman and suggested that "if possible please make sure that you keep your phone on you when I am meeting with you to make sure we can keep all lines of communication open." [Filing No. 50-10 at 1.] Manager Foreman responded, "Thank you for your opinion of when I should carry my phone." [Filing No. 50-10 at 1.] Ms. Lewis believes that Manager Foreman's response is an example "taunting [her] to force [her] to quit as [Manager Foreman] continue[d] to make [her] life miserable." [Filing No. 50-10 at 1.]

### K.    Manager Foreman Reports Ms. Lewis to Human Resources Regarding the Quality of Her Work and Behavior Inconsistent with an Accommodation

On October 17, 2022, Manager Foreman emailed Director Geibel and Human Resources Director Gurney to report "another instance of insubordination." [Filing No. 50-11 at 1.] She expressed exasperation that asking Ms. Lewis for an accounting of her work was "somehow related to [Manager Foreman] filing a complaint" against Ms. Lewis. [Filing No. 50-11 at 1 (emphasis omitted).] She noted that Ms. Lewis's work logs seemed to represent a lot time for not a lot of work. [Filing No. 50-11 at 1.] And she noted that on October 13, during one of the meetings when Ms. Lewis was late, Ms. Lewis "hugged and stood close proximity to the other staff member while making small talk[,] [b]ehavior not indicative of being concerned about health. The staff member later commented on the open hostility that [Ms. Lewis] demonstrated towards" Manager Foreman. [Filing No. 50-11 at 1.] Manager Foreman stated that Ms. Lewis "had her kids with her when she dropped off parcels . . . because they were on their way to SkyZone" and that the following day she took time off "to take her kids to The Children's Museum." [Filing No. 50-11 at 1.] To Manager Foreman, these "activities [were] outside of work hours but [were] not in alignment with strict COVID precaution behavior." [Filing No. 50-11 at 1.] Manager Foreman asked for "guidance on how to address this situation, which [was] not improving." [Filing No. 50-11 at 1.] Manager Foreman agreed in her deposition, though, that she did not report "any other employees' activities outside of work hours." [Filing No. 50-3 at 91.]

### L.    Ms. Lewis Discusses Her Work with Manager Foreman and Director Geibel During a Meeting

The next day, on October 18, 2022, Ms. Lewis had her regular check-in phone call with Manager Foreman. [Filing No. 50-1 at 116.] Ms. Lewis and Manager Foreman discussed an upcoming "diversity inclusion week," which Ms. Lewis wanted to withdraw from "because of what [she was] . . . going through." [Filing No. 50-1 at 116-17.] Unbeknownst to Ms. Lewis, Director

Geibel was also on the call.  [Filing No. 50-1 at 117.]  Director Geibel shared his thoughts about the diversity inclusion week, and Ms. Lewis responded that she wanted to withdraw because Director Geibel and Manager Foreman allegedly "report[ed] [her] to HR."  [Filing No. 50-1 at 117.]  Both Director Geibel and Manager Foreman denied reporting Ms. Lewis to Human Resources.  [Filing No. 50-1 at 117.]  Manager Foreman did not mention that she actually did email Human Resources Director Gurney to report Ms. Lewis's lapses in social distancing and taking her children to SkyZone and the Children's Museum.  [Filing No. 50-1 at 117.]

Ms. Lewis states that Director Geibel and Manager Foreman said "[w]e just want to make sure everything is going okay with documentation" because her work logs suggested an extensive amount of time spent on not much work, so they were concerned because they "didn't know what was going on."  [Filing No. 50-1 at 118.]  Manager Foreman stated that she wanted a list of the projects that Ms. Lewis was actively working on.  [See Filing No. 50-3 at 140].  Ms. Lewis justified her time spent speaking at length to an apparently problematic consultant, and Director Geibel "started to get very upset and decided to say that he was going to go on ahead and get off the call because he felt like he wanted to not have to deal with the phone call."  [Filing No. 50-1 at 119.]  Ms. Lewis testified that from her perspective "both of them were going back and forth with [her] online, and [she] felt very intimidated," "accosted," and "interrogated," which was an overall "very overwhelming" and "baffling" experience, which resulted in her experiencing "worked up . . . emotions" and "high blood pressure."  [Filing No. 50-1 at 117-20.]

The call was on a teleconference platform, which typically shows call participants, but Ms. Lewis states that Director Geibel's call-participant information was not there; from Ms. Lewis's perspective, "it just felt like an ambush" and she believed the "ambush" was related to a grievance she filed against them.  [Filing No. 50-1 at 121-23.]  Later that day, Ms. Lewis emailed Director

Geibel to inform him that he should provide her notice of when he comes to her daily one-on-ones, stating:

> it would be nice to know that you are on the call beforehand so that your presence is known. . . . I'm sure if you were on a one-on-one call with [Director Geibel's superior] and [another of his superiors] was on the call, you would feel some kind of way about it. . . . I am all about brainstorming, but when the conversation steered towards a complaint made against me to HR [it] made the entire conversation upsetting and uncomfortable for me . . . .

[Filing No. 50-14 at 2.]

A few hours later that day, Manager Foreman emailed Ms. Lewis to admonish her that "talking over [Director Geibel] was disrespectful and inappropriate" and that Director Geibel came to the meeting because Manager Foreman asked him to attend.  [Filing No. 50-14 at 1.]

Later that day, Ms. Lewis's teleconference account indicated she was "away" for 53 minutes.  [Filing No. 50-14 at 13.]  Manager Foreman emailed Ms. Lewis and asked why and Ms. Lewis stated that she was "dealing with a matter with HR and [she] took [her] lunch." [Filing No. 50-14 at 12.]

### M.    Manager Foreman and Ms. Lewis Dispute Who Should Generate a Report Tabulating Her Unfinished Work

On October 27, 2022, Manager Foreman engaged in an email exchange with Ms. Lewis, stating "do [not] forget to send the active parcel/relo[cation] report today." [Filing No. 60-8 at 5.] Ms. Lewis responded that she did not know what else to send aside from the list of parcels her consultants were working on and that only another INDOT employee, Data Integrity Specialist Devin Hutcheson, "ha[d] the liberty of pulling up data reports." [Filing No. 60-8 at 4-5.] Manager Foreman responded that she "d[id] not want to sift through other people's emails.  [She was] directing [Ms. Lewis] to compile a report with the data" on a "weekly basis." [Filing No. 60-8 at 4.] Manager Foreman emphasized that "[t]his report is not a summary of your work logs." [Filing No. 60-8 at 4.] Ms. Lewis replied that she would reach out to Mr. Hutcheson to get the information.

[Filing No. 60-8 at 3-4.]  Director Geibel replied in the email chain to state that they were "not looking for something from" Mr. Hutcheson because he did not review and manage the relocation process.  [Filing No. 60-8 at 3.]  Instead, Director Geibel stated they were "looking for a summary from [Ms. Lewis] that ha[d] [her] insight on all the finite details of the relocation projects."  [Filing No. 60-8 at 3.]  Ms. Lewis reiterated that she would reach out to Mr. Hutcheson to ask him to teach her how to do it.  [Filing No. 60-8 at 2.]  Manager Foreman replied asking "is it not possible . . . to survey . . . consultants and enter that data into a spreadsheet?  No special training needs to be done.  No coordination with [Mr. Hutcheson] is required or desired.  My original question to you was 'how do you know what you need to work on?'"  [Filing No. 60-8 at 2.]  Ms. Lewis replied she does not have enough time to reach out to consultants for the information and reiterated that she would reach out to Mr. Hutcheson.  [Filing No. 60-8 at 1.]  Manager Foreman forwarded the entire email thread to Human Resources Director Gurney, stating that Ms. Lewis was "blatantly refusing to produce the answers" she and Director Geibel were seeking.  [Filing No. 60-8 at 1.]

### N.    Manager Foreman Starts an Email Thread to Document Ms. Lewis's Alleged Misconduct to Avoid the Appearance of Retaliation

Human Resources Director Gurney told Manager Foreman to start an email thread to document "inappropriate/egregious behavior that is not to be written up as insubordination, due to the open grievance against [Manager Foreman]."  [Filing No. 50-3 at 65-66.]  Human Resources Director Gurney also told Manager Foreman that she was "not allowed to write up Ms. Lewis" because "[i]t would appear as retaliation – it might appear."  [Filing No. 50-3 at 66.]  So on October 27, 2022, the same day of the dispute surrounding reporting Ms. Lewis's work report, Manager Foreman started the email thread with Human Resources Manager Gurney.  [Filing No. 50-3 at 65-66.]  The infractions in the thread included when Ms. Lewis provided a report late and incorrectly; this report was supposed to document what Ms. Lewis was working on.  [Filing No.

50-3 at 67.]  Another incident was when Ms. Lewis took longer than expected to respond to a consultant.  [Filing No. 50-3 at 72.]  This was a problem because these kinds of communications fundamentally concerned "someone being displaced from their residence and they needed a place to live and they needed their questions answered."  [Filing No. 50-3 at 126.]  Under other circumstances, Manager Foreman states that she would have written up Ms. Lewis for that – though she agreed that she did not "write anybody else up for not" responding to a consultant quickly enough.  [Filing No. 50-3 at 72.]  Manager Foreman did not write Ms. Lewis up as a way of "coaching" her performance because "[e]ncouragement from HR" prohibited Manager Foreman from doing so.  [Filing No. 50-3 at 77.]  If it were up to Manager Foreman, she states that she would have terminated Ms. Lewis by that time.  [Filing No. 50-3 at 75-76.]

### O.    The Indiana State Personnel Department Dismisses Ms. Lewis's Second Internal Complaint

The parties do not agree on the date, but both agree that the State Personnel Department dismissed Ms. Lewis's second complaint.  [Filing No. 12 at 9 (Ms. Lewis's Complaint in this action that her second internal complaint at INDOT was dismissed on December 12, 2022, and Defendants' Answer declining to specify the date).]  But Manager Foreman admitted in her deposition that she received permission to take disciplinary action against Ms. Lewis only after the close of her second complaint.  [Filing No. 50-3 at 76.]

### P.    Director Geibel Develops a Report That Reveals Ms. Lewis Was Behind on Hundreds of Parcels

In the beginning, Director Geibel had no concern that Ms. Lewis would be a successful member of the relocation team.  [Filing No. 50-2 at 25.]  But over time, Director Geibel observed deficiencies in Ms. Lewis's performance regarding "requests for data, . . . requests for transparency of information, reporting, acknowledgment of activities, what was being done, discussion of procedures and processes," and a lack of material.  [Filing No. 50-2 at 25.]  Director Geibel never

did any "one-on-one coaching" with Ms. Lewis, but he did express his concerns in a team setting about how they could "get better" and should look at the work from a "reporting perspective." [Filing No. 50-2 at 25.]  In response to some of Ms. Lewis's deficiencies, Director Geibel had "conversations about them and e-mails." [Filing No. 50-2 at 26.]  Director Geibel did not expect Ms. Lewis to "go in and generate a report . . . that would spit out the same kind of things that Mr. Hutcheson did," but he emphasized that they were "a singular team" and he "expect[ed] teammates to work as a team to generate things that [they] need[ed] from a reporting perspective." [Filing No. 50-2 at 28.]  Nonetheless, during one of these interactions, Ms. Lewis told Director Geibel that he should "find and run a report and create it" himself, which he did.  [See Filing No. 50-2 at 26.]

To build the report that Ms. Lewis did not provide, Director Geibel worked with Mr. Hutcheson to "pull[] data from the databases," "track outstanding relocations when they started, when they ended, what was outstanding," and "at what phase they were in." [Filing No. 50-2 at 26.]  The objective was to "get a grasp of the volume and the activities, to know where things are, how many parcels are outstanding, what is open, [and] what is closed." [Filing No. 50-2 at 26-27.]  The reports were not automatically generated at first; the correct database infrastructure had to be designed and "tweak[ed] . . . so that you can get a good understanding of the material that this report is kicking out." [Filing No. 50-2 at 27-28.]  This particular report that Director Geibel worked on with Mr. Hutcheson took "a week and a half or two weeks," plus "some additional time tweaking it." [Filing No. 50-2 at 28.]  If Ms. Lewis were directed to put a similar report together, and parameters of that report did not already exist, then Director Geibel would have expected her to work with Mr. Hutcheson to create it.  [Filing No. 50-2 at 28-29.]

Ms. Lewis was asked during her deposition whether she simply could have manually counted her outstanding parcels, to which she responded "that could possibly be done," but she was "trying to work smarter, not harder," so she wanted training to create the kind of report that Mr. Hutcheson would normally create. [Filing No. 50-1 at 199-200.] Ms. Lewis then asked her consultants what parcels they had outstanding, and Ms. Lewis compiled them to send to Manager Foreman. [Filing No. 50-1 at 193.] Ms. Lewis testified that because she oversaw those consultants, "what [she was] actually working on is what they [were] actually working on." [Filing No. 50-1 at 193.]

From Manager Foreman's perspective, Mr. Hutcheson could run a report tabulating all of the outstanding parcels, but Manager Foreman specifically wanted to know what Ms. Lewis was actively working on at that moment, as opposed to the general docket of work to be done. [Filing No. 50-3 at 68-69.] Manager Foreman understood there to be a distinction between the consultant work and Ms. Lewis's work. [Filing No. 50-3 at 70-71.] Once the consultants did their part, Ms. Lewis would evaluate their work. [Filing No. 50-3 at 70-71.] Ms. Lewis's part of the work is what Manager Foreman was seeking and she explained as much to Ms. Lewis. [Filing No. 50-3 at 70-71.] Manager Foreman testified that to know what specific parcels Ms. Lewis was working on, "[a]ll she had to do was take out a piece of paper and write down what she was working on . . . . [Manager Foreman] didn't need a report. [Manager Foreman] wanted a summary of what [Ms. Lewis] was working on." [Filing No. 50-3 at 79.] Manager Foreman believed that Ms. Lewis was being "stubborn and difficult" and was intentionally avoiding providing the information. [Filing No. 50-3 at 79.] Manager Foreman would have written Ms. Lewis up for not providing the information, but she "was advised not to write [Ms. Lewis] up." [Filing No. 50-3 at 75.]

Eventually, Director Geibel and Mr. Hutcheson ran a report and they discovered that Ms. Lewis had left "over 400 parcels that were not closed out," including some of the largest projects they were working on in the State of Indiana.  [Filing No. 50-2 at 56-7.]  This was the first time that Director Geibel had seen this number of outstanding parcels.  [Filing No. 50-2 at 60.]  Manager Foreman stated that some of these parcels had "been with [Ms. Lewis] for two and a half years," so "[t]here had been time to close them out."  [Filing No. 50-3 at 153.]  Director Geibel explained that as a result of the backlog, the Department risked "losing federal funding because [they] were not doing their jobs," and that "having that kind of risk on the books as a division or agency is just 100 percent not acceptable."  [Filing No. 50-2 at 58.]  The relocation department "had to derisk very, very fast, and it was a lot of folks, a lot of internal folks and a lot of additional consultants that [they] had to hire to take over and fix the risk."  [Filing No. 50-2 at 57.]  Director Geibel states that "to get . . . caught back up," the department incurred fees of "[o]ver $150,000."  [Filing No. 50-2 at 57-59.]  Ms. Lewis does not controvert the existence of this backlog or its costs.  [*See generally* Filing No. 62 at 7-16 (Ms. Lewis's Statement of Material Facts in Dispute).]  The revelation of Ms. Lewis's backlog and the significant cost to correct it was "the eye-opening component" that informed Director Geibel's decision to recommend Ms. Lewis be terminated.  [Filing No. 50-2 at 57.]

### Q.    Director Geibel Reflects on Allegedly Insubordinate Comments by Ms. Lewis

Though Director Geibel did not provide exact dates for certain incidents of Ms. Lewis's insubordination, he testified in his deposition that his relationship with Ms. Lewis was "insubordinate, contentious, [and] disrespectful, right from the beginning."  [Filing No. 50-2 at 30.]  For example, Ms. Lewis made comments "in meetings with consultants and other managers about [his] inability to run a department."  [Filing No. 50-2 at 31.]  The first of Ms. Lewis's comments occurred "within three months" of his starting the job when she stated that Director

26

Geibel was "unable to run this department because [he] did not have [his] real estate license." [Filing No. 50-2 at 31.]  In response to that comment, Director Geibel "immediately got up and left the meeting." [Filing No. 50-2 at 33.]  Director Geibel did not discipline Ms. Lewis for that comment.  [Filing No. 50-2 at 32.]  Director Geibel spoke about the incident with someone in the State Personnel Department, and he was told "basically to let it go."  [*See* Filing No. 50-2 at 32.] Director Geibel indicates that but for those instructions, he would have disciplined Ms. Lewis, but "because [he was] a State employee," he "had to curtail how [he] would typically do things." [Filing No. 38.]

The next interaction between Director Geibel and Ms. Lewis surrounded promoting her from Program Director 2 upwards to Program Director 1, which was officially processed by March 2021.  [Filing No. 50-2 at 34; Filing No. 50-1 at 32-33]  Director Geibel worked over "months and months" to help justify the promotion.  [Filing No. 50-2 at 34.]  After they "got the promotion done and got the raise done," Ms. Lewis told him that "the percentage of the increase in raise was not sufficient."  [Filing No. 50-2 at 34.]  Director Geibel testified that Ms. Lewis complained to him and filed a complaint with the State Personnel Department alleging that Director Geibel "only gave [her] a 9 percent increase . . . versus somebody getting a 12 percent increase who also was promoted right around the same time period," all because she was African American.  [Filing No. 50-2 at 34-35.]  Director Geibel explained that the other individual received a higher raise because that individual's salary "was well below the salary range" of Ms. Lewis to begin with.  [Filing No. 50-2 at 35.]  Director Geibel did not "speak with anybody at the State Personnel Department about disciplining her for making this complaint," since it was "out of [his] purview," as it was the State Personnel Department that set salaries.  [Filing No. 50-2 at 35-36.]  Director Geibel says that no one from the State Personnel Department interviewed him about Ms. Lewis's discrimination

complaint because he was helping to "push[] for the promotion and justify[] the promotion" from the beginning.  [Filing No. 50-2 at 36.]

### R.    Ms. Lewis Is Terminated from INDOT

Director Geibel recommended to the State Personnel Department that Ms. Lewis be terminated, and the Department agreed.  [Filing No. 50-2 at 53.]  Director Geibel testified that although he must follow the procedures set out by INDOT and INDOT is the entity that officially terminates employees, "[u]ltimately, it [was his] call" to terminate Ms. Lewis.  [Filing No. 50-2 at 29-30.]  Notably, Manager Foreman also testified that it was her decision to terminate Ms. Lewis.  [Filing No. 50-3 at 75.]  Manager Foreman testified that she would have terminated Ms. Lewis earlier but she "couldn't."  [Filing No. 50-3 at 76.]  Manager Foreman agreed that she "receive[d] the directive that [she] could in fact take disciplinary action against Ms. Lewis" only after "the close of the investigation of [Ms. Lewis's] grievance."  [Filing No. 50-3 at 76.]

On December 20, 2022, Manager Foreman and another colleague called Ms. Lewis to inform her she would be terminated from her role at INDOT.  [Filing No. 50-1 at 176.]  On December 22, 2022, the INDOT formally terminated Ms. Lewis's employment, citing "poor performance and insubordinate conduct."  [Filing No. 50-23 at 1.]

### S.    Ms. Lewis Files a Charge with the Equal Employment Opportunity Commission

Ms. Lewis filed a formal charge with the Equal Employment Opportunity Commission ("EEOC") on January 12, 2023, alleging disability discrimination, race discrimination, and retaliation by INDOT, Director Geibel, and Manager Foreman.  [Filing No. 1 at 5.]

### T.    This Lawsuit

On October 17, 2023, Ms. Lewis filed suit in this Court, alleging both disability discrimination and retaliation under the Rehabilitation Act, Section 1981, and Title VII.  [Filing

No. 1.]  The parties later filed a joint Motion to Dismiss the counts against Manager Foreman, which the Court granted.  [Filing No. 63; Filing No. 65.]  The remaining Defendants in this case are INDOT and Director Geibel, who have proceeded with a Motion for Summary Judgment as to the Title VII and Rehabilitation Act claims against INDOT and the Section 1981 claims against Director Geibel.  [Filing No. 49.]

### III.
### DISCUSSION[1]

**A.    Race Discrimination and Retaliation in Violation of Section 1981 against Director Geibel**

In Ms. Lewis's Statement of Claims, she alleges that Director Geibel "engaged in unlawful discrimination" and "unlawful retaliation" "in violation of 42 U.S.C. § 1981."  [Filing No. 42 at 1-2.]  Director Geibel argues there is no private right of action against state actors under Section 1981, so Director Geibel cannot be held liable at all.  [Filing No. 53 at 11.]  Ms. Lewis responds that state actors can be held liable under Section 1981 in their individual capacity, noting that it is an undecided question.  [Filing No. 62 at 20 (citing *Taylor v. Bd. of Educ. of the City of Chicago*, No. 21-1359, 2021 WL 5985534 at *3 (7th Cir. Dec. 17, 2021) ("[W]e have not addressed whether actions against state actors in their individual capacities are allowed" under § 1981.)].  Director Geibel replies that Section 1983 is the exclusive remedy for Section 1981 violations by state actors and that prior cases dismissed suits in official and individual capacity.  [Filing No. 68 at 11-12 (citing *Outley v. City of Chicago*, 407 F. Supp. 3d 752, 763 (N.D. Ill. 2019) (holding that "to infer a remedy against state actors under § 1981 would contravene the specific remedy created by Congress under § 1983.")].

---

[1] Unfortunately, Ms. Lewis's briefing on summary judgment is disorganized and fails to track the arguments raised by the Defendants.  It is thus not only unhelpful, but a hindrance to the Court. The Court's analysis thus largely tracks the order of the issues as presented by the Defendants.

While the Court acknowledges that the Seventh Circuit has stated that it has not yet decided the question, that is a far cry from the Seventh Circuit deciding the question in Ms. Lewis's favor. *See Campbell v. Forest Preserve Dist. of Cook Cnty., Ill.*, 752 F.3d 665, 670 (7th Cir. 2014) (holding that "to infer a remedy against state actors under § 1981 would contravene the specific remedy created by Congress under § 1983"). Each circuit to address the question has decided against Ms. Lewis's interpretation. Some of them specified that Section 1981 did not extend to private rights of action against a state actor in their individual capacities, and some did not. Notably, the Ninth Circuit formerly permitted Section 1981 claims against individuals, and even then, the Ninth Circuit overruled its own precedent and now does not permit private rights of action against individuals. *Yoshikawa v. Seguirant*, 74 F.4th 1042, 1047 (9th Cir. 2023) (holding that "[a] plaintiff seeking to enforce rights secured by § 1981 against a state actor must bring a cause of action under § 1983") *overruling Fedn. of African Am. Contractors v. City of Oakland*, 96 F.3d 1204 (9th Cir. 1996). Other circuits have decided similarly. *See, e.g.*, *McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir. 2009) (holding that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units."); *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 n.1 (4th Cir. 1995) (holding "We do not believe that . . . the Civil Rights Act of 1991, which added subsection (c) to § 1981" provides a private right of action against state actors); *Oden v. Oktibbeha Cnty.*, 246 F.3d 458, 464 (5th Cir. 2001) (holding that "when a plaintiff asserts a cause of action under § 1981 for discrimination in the terms and conditions of a municipal employment contract, the proper defendant is the government employer in his official capacity," thereby precluding a claim against a state actor in his individual capacity); *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) (holding that "§ 1983 is the exclusive mechanism to vindicate violations of § 1981 by an

individual state actor acting in his individual capacity."); *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006) (holding that "damages claims against state actors for § 1981 violations must be brought under § 1983"); *Butts v. Cnty. of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000) (holding that "§ 1981(c) makes clear that the section creates a right that private or state actors may violate but does not itself create a remedy for that violation."). The Court does not believe that the Seventh Circuit would take the opposing view and create a lopsided circuit split to permit individual liability under Section 1981.

In any event, Ms. Lewis never made it clear she was suing Director Geibel in his individual capacity, so it is too late to do so now. [*See* Filing No. 1 at 6-8 (Complaint stating that Director Geibel "acted under color of State law"); *see also* Filing No. 42 (Ms. Lewis's Statement of Claims)]. Ms. Lewis had a remedy under 42 U.S.C. § 1983 and she purposefully chose not to pursue it in an effort to increase potential damages. [Filing No. 62 at 21.] She cannot now change course. *See Jackson v. Regions Bank*, 838 F. App'x 195, 198 (7th Cir. 2021) (finding "no abuse of discretion in the district court's enforcement of its requirement that [the plaintiff] specifically state [her] theories of relief" in the Statement of Claims).

The Court **GRANTS** Defendants' Motion for Summary Judgment, [49], as to Ms. Lewis's Section 1981 claims against Director Geibel.[2]

## B.    Disability Discrimination in Violation of the Rehabilitation Act against INDOT

INDOT argues that it is immune to any suit under the Americans with Disabilities Act ("ADA") because of sovereign immunity. [Filing No. 53 at 11.] Ms. Lewis responds that her claims arise under the Rehabilitation Act, not the ADA. [Filing No. 62 at 17.] INDOT replies that

---

[2] Ms. Lewis alleged a Section 1981 claim only against Director Geibel, not INDOT. [Filing No. 42]

Ms. Lewis "cannot maintain any of her claims under the ADA[] because INDOT, a state agency, has sovereign immunity." [Filing No. 68 at 12.]

The Court observes that the first page Ms. Lewis's Complaint states that "[t]his suit is brought under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794." [Filing No. 1 at 1.] She states that she is a "qualified individual with a disability under the Rehabilitation Act," and is also suing for "retaliation under the Rehabilitation Act." [Filing No. 1 at 5-6.] In Ms. Lewis's Statement of Claims, she alleges that INDOT "engaged in unlawful discrimination" and "unlawful retaliation" "in violation of the Rehabilitation Act." [Filing No. 42 at 1-2.] In light of the foregoing, the Court struggles to discern INDOT's argument under the ADA. In any event, Congress has provided that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act" if receiving federal funding. 42 U.S.C. § 2000d-7. And the Seventh Circuit has accordingly held "the Rehabilitation Act is enforceable in federal court against recipients" of federal funding, which no party disputes that INDOT receives. *Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000); [Filing No. 50-2 at 58 (Director Geibel expressing concern that as a result of the backlog the department risked "losing federal funding")]. The Court will analyze Ms. Lewis's disability discrimination and retaliation claims under the Rehabilitation Act.

The Rehabilitation Act Provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination . . . under any program or activity" "receiving federal financial assistance." *Swain v. Wormuth*, 41 F.4th 892, 897 (7th Cir. 2022) (quoting 29 U.S.C. § 794(a)). With the exception of the standard of causation, "[t]he Rehabilitation Act expressly incorporates the standards and procedures applicable to claims brought under the" ADA. *Swain*, 41 F.4th at 897 (citing 29 U.S.C.

§ 794(d)).  To support a claim for disability discrimination under the ADA, a plaintiff must show, "(1) she is disabled; (2) she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) her employer took an adverse job action against her because of her disability or without making a reasonable accommodation for it." *Basden v. Prof'l Transp., Inc.,* 714 F.3d 1034, 1037 (7th Cir. 2013).

In evaluating discriminatory motive under the ADA, courts often rely on the framework under *McDonnell Douglas*, in which a plaintiff can make a prima facie case of discrimination by demonstrating that (1) she is disabled . . . and/or engaged in a statutorily protected activity; (2) she performed her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment." *Brooks v. Avancez*, 39 F.4th 424, 434 (7th Cir. 2022).  The Court begins with the parties' arguments regarding whether Ms. Lewis was disabled.

       1.   *Discrimination*

          a.   <u>Whether Ms. Lewis Was Disabled</u>

INDOT argues that Ms. Lewis was not actually disabled because of her kidney transplant since her difficulties sleeping and controlling blood pressure are not substantially limiting; it argues she does not nap during the day or have diminished thinking.  [Filing No. 53 at 3; Filing No. 53 at 13.]  INDOT avers that there is no record of her disability since her treatment has only been going to the doctor twice a year and she was able to go to a football game and out with friends. [Filing No. 53 at 15.] And INDOT argues that Ms. Lewis was not regarded as disabled because Manager Foreman knew only that Lewis needed an accommodation but not what the health problem was and Director Geibel knew of a kidney transplant but only vaguely recalled that fact. [Filing No. 53 at 16.]

Ms. Lewis responds that she is actually disabled because of the substantial limitation to the major bodily function of her endocrine system because she must take immunosuppressing drugs and is at risk of serious harm from infections.  [Filing No. 62 at 18-19.]  She does not respond specifically to the questions of whether she had a record of disability or was regarded as disabled. [*See* Filing No. 62 at 18-19.]

INDOT replies that Ms. Lewis is not disabled since she is not substantially limited in a major life activity and reiterates that she does not need to nap and does not have problems thinking. [Filing No. 68 at 14.]  INDOT states that Ms. Lewis has waived any argument regarding her having a record of disability and being regarded as disabled because she did not respond to INDOT's arguments.  [Filing No. 68 at 13.]

As to the standards of what makes an individual disabled, "[t]he Rehabilitation Act incorporates the standards applicable to Title I of the ADA." *Brumfield v. City of Chicago*, 735 F.3d 619, 630 (7th Cir. 2013) (citations omitted).  "A 'disability' under the ADA includes 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual.'" *Equal Emp. Opportunity Comm'n v. Charter Commc'ns, LLC*, 75 F.4th 729, 733 (7th Cir. 2023) (quoting 42 U.S.C. § 12102(1)).  "[A] major life activity . . . includes the operation of a major bodily function, including but not limited to . . . endocrine . . . functions."  42 U.S.C. § 12102(2)(B).  Ms. Lewis has provided uncontroverted evidence that she had a kidney transplant that requires her to be on constant immunosuppressant medication and immunocompromised individuals were given specific protections under COVID protocols due to the increased risk of infection.  The Court finds that Ms. Lewis has at least raised an issue of fact as to whether she is actually disabled.  Given this finding, the Court need not examine whether Ms. Lewis had a record of disability or was regarded as disabled.

b.     *McDonnell Douglas* Analysis – Focus on Pretext in Discipline Cases

The next elements of the prima facie case are whether Ms. Lewis "(2) . . . performed her job to her employer's legitimate expectations; (3) . . . suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment." *Brooks*, 39 F.4th at 434.  If Ms. Lewis were to meet these elements, the Court would turn to the employer for evidence showing that the employee failed to meet its legitimate expectations, at which point the employee would have to show that the employer's answer was a "pretext"; that is, "an attempt to mask a discriminatory reason with a legitimate excuse.'" *Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023).  But here, the Court need not traverse the entire prima facie case – where the employer's "legitimate expectations" and the employee's "pretext" allegations overlap, the Court can skip the prima facie analysis and directly address pretext. *Brooks*, 39 F.4th at 435. This approach to the analysis aligns with the "'whole evidence' outlook espoused by" *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).  *Brooks*, 39 F.4th at 435.  (citing *Ortiz*, 834 F.3d at 764-65).  Here, INDOT argues that it honestly believed that Ms. Lewis was insubordinate and ineffective, which would constitute falling short of its legitimate expectations.  Consequently, the Court inquires directly into the parties' arguments regarding pretext.[3,4]

---

[3] The Court notes that no party disputes that Ms. Lewis's termination was an adverse action.  As to other ways in which Ms. Lewis was allegedly mistreated, INDOT denies they were adverse actions.  [Filing No. 53 at 25-27.] INDOT states that certain instructions given to Ms. Lewis, such as being asked to perform additional job duties and doing a daily one-on-one meeting, do not constitute adverse actions.  [Filing No. 53 at 25-27.]  Ms. Lewis does not contest this conclusion and instead uses those incidents as evidence of her supervisors' discriminatory intent.  [Filing No. 62 at 22 (stating that "[t]hese escalating punishments reflected animus by her supervisors"); *see also id.* at 26 (stating that Ms. Lewis is "not before the Court simply because her job got more difficult").]  The Court thus evaluates whether Ms. Lewis's protected status and activity had a causal connection only to her termination.

[4] The Court notes also that when it proceeds directly to pretext, it need not answer whether Ms. Lewis was "otherwise qualified to perform the essential functions of the job with or without

INDOT argues that the reason Ms. Lewis was terminated was because of her performance and insubordination, not her disability. [Filing No. 53 at 25-28.] INDOT lists Ms. Lewis's many alleged infractions, including the following: she declined to mail checks, [Filing No. 53 at 17]; she was insubordinate by unilaterally telling the Finance Department she would not enter data, [Filing No. 53 at 18.]; she was late to multiple meetings while working remotely, [Filing No. 53 at 17-19]; she was marked "Away" on her teleconferencing system for almost an hour without notifying a supervisor, [Filing No. 53 at 23]; she made negative comments during meetings questioning Director Geibel's ability to do his job, [Filing No. 53 at 18]; she talked over Director Geibel in meetings, [Filing No. 53 at 23]; she was "insubordinate, contentious, disrespectful" from the beginning of her employment, [Filing No. 53 at 10]; and she was behind on work by several hundred parcels. [Filing No. 53 at 9.]

Ms. Lewis argues that INDOT subjected her to "escalating punishments" after complaining about her work conditions in relation to her disability. [Filing No. 62 at 22.] For example, after learning that Ms. Lewis attended a football game during non-working hours, Manager Foreman demanded additional medical documentation to justify Ms. Lewis's accommodation. [Filing No. 62 at 4-5.] Ms. Lewis states that Manager Foreman then required Ms. Lewis to come to the office and stuff envelopes, which was a *de facto* revocation of a significant component of Ms. Lewis's accommodation, even though Ms. Lewis was later assured she did not have to stuff envelopes. [Filing No. 62 at 5.] Ms. Lewis argues that the fact that the State Personnel Department restored Ms. Lewis's accommodation to not stuff envelopes was evidence of the Department overruling Director Geibel's and Manager Foreman's hostile intent. [Filing No. 62 at 26.] Ms. Lewis notes,

---

reasonable accommodation." *See Brooks*, 39 F.4th at 433-34 (assuming that the employee was disabled and then proceeding directly to pretext).

for example, that Manager Foreman was admittedly frustrated with Ms. Lewis's accommodation, and she was subjected to increased scrutiny that was retaliatory in nature. [Filing No. 62 at 26.] Ms. Lewis states that Manager Foreman required Ms. Lewis to attended daily one-on-one meetings because she worked remotely while other employees working hybrid schedules had no such requirement. [Filing No. 62 at 5.] Ms. Lewis also states that Manager Foreman reported Ms. Lewis to human resources to say she visited SkyZone and the Children's Museum. [Filing No. 62 at 12.] Ms. Lewis avers that Manager Foreman required Ms. Lewis to generate a report of all of her active parcels even though Ms. Lewis did not have access to the database that held that information, as well as prohibiting her from asking for help from Mr. Hutcheson, who did have access to that database. [Filing No. 62 at 6-7.] Ms. Lewis states that this presents a contradiction between Director Geibel's stance that Ms. Lewis collaborate with other employees to produce reports and his and Manager Foreman's insistence that she not collaborate with Mr. Hutcheson to produce the desired report. [Filing No. 62 at 7.] Ms. Lewis argues that she was nominally terminated for "poor performance and insubordination," but that was actually a pretext for discrimination on the basis of her disability; she notes that it was only after her second complaint was dismissed that she was finally terminated, only eight days later. [Filing No. 62 at 7.] Ms. Lewis argues that the lack of progressive discipline indicates that the termination was pretextual. [Filing No. 62 at 30.] Ms. Lewis argues that the standard of causation is "but for" causation. [Filing No. 62 at 22.]

INDOT replies that at the time of Ms. Lewis's termination, her performance was poor. [Filing No. 68 at 10.] INDOT states that daily one-on-ones were required because Ms. Lewis was frequently late or not attending to her work, and was the only remote employee, so such meetings were required to keep abreast of her progress. [See Filing No. 68 at 16.] INDOT avers that the

report request was reasonable because Director Geibel and Manager Foreman wanted Ms. Lewis's specific input on what she was working on, and her response was insubordinate. [Filing No. 68 at 9; 16-17.] INDOT argues that Ms. Lewis's status as an at-will employee meant there was no requirement for progressive discipline. [Filing No. 68 at 20.] It states that the additional medical documentation was requested by the State Personnel Department, not INDOT, after concerns were raised by employees about Ms. Lewis's attending social events. [Filing No. 68 at 2.] INDOT argues that Director Geibel never admitted he wanted to get rid of Ms. Lewis from the very beginning but instead testified that Ms. Lewis was insubordinate because of her negative comments about him in meetings criticizing his ability to run the department. [Filing No. 68 at 6.] As to Manager Foreman's frustration's, INDOT argues that was justified because of the lack of transparency and communication from Ms. Lewis, not the mere fact of Ms. Lewis's being disabled and seeking an accommodation. [Filing No. 68 at 16.] INDOT argues that there is no evidence of suspicious timing or pretext, but rather, any adverse actions were motivated by legitimate employment expectations that Ms. Lewis perform her job. [Filing No. 68 at 15-19.] INDOT argues further that the standard of causation for Ms. Lewis's retaliation claims under the Rehabilitation Act is "solely by reason of" causation and that the reason Ms. Lewis was terminated was solely by reason of her performance, not her disability. [Filing No. 68 at 14.]

The Seventh Circuit has explained that to demonstrate a material issue of fact as to pretext, a plaintiff "must show that either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible." *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 573 (7th Cir. 2021) (quoting *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)). "Where a defendant has proffered more than one reason for the challenged action, a plaintiff must address all of the" the employer's

explanations. *Hudson*, 375 F.3d at 561. In evaluating the employer's explanations, the pretext inquiry concerns "the honesty of the employer's explanation." *Crain*, 63 F.4th at 593. "[A]n employer's dishonest explanation," can itself "support an inference that its real reason was unlawful." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 932 (7th Cir. 2020). The inquiry evaluates whether the plaintiff has shown that "implausibilities, inconsistencies, or contradictions" render the employer's asserted reasons "unworthy of credence." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 938 (7th Cir. 2022). As applied to an employer's investigation into employee misconduct, the pretext inquiry asks "whether [the employer] came to an honest conclusion about the situation based on the information uncovered by the investigation." *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 784 n.1 (7th Cir. 2005).

In this case, INDOT's non-discriminatory explanations for Ms. Lewis's termination are her insubordination and ineffectiveness. As to INDOT's beliefs regarding Ms. Lewis's insubordination, Ms. Lewis does not controvert key allegations against her: that she told another department supervisor that she would not do more work, that she spoke over Director Geibel in meetings, and that she negatively commented about Director Geibel's ability to run the department in front of their colleagues. Ms. Lewis points to Director Geibel's isolated remark – that she was insubordinate from the beginning – but fails to disclose that his remark described Ms. Lewis's disparaging him in meetings. [Filing No. 50-2 at 31 ("Q. . . . [a]nd when you say it was insubordinate from day one, what do you mean by that? A. . . . comments made in meetings with consultants and other managers about [his] inability to run a department").]

As to INDOT's beliefs regarding Ms. Lewis's ineffectiveness, the Court considers Ms. Lewis's job description for Program Director 1, which set the expectations that Ms. Lewis was obligated to meet. As a Program Director 1, Ms. Lewis was responsible for "administer[ing] state

and federal relocation programs statewide for the Indiana Department of Transportation and local governments." [Filing No. 50-18 at 1.]  The job called for Ms. Lewis to be a "[s]ubject [m]atter [e]xpert" regarding the "displacements of persons by state and local highway projects." [Filing No. 50-18 at 1.]  Notably, the Program Director 1 job description stated that "[f]ailure to meet deadlines and properly oversee compliance of state and federal laws could result in delays in construction and loss of project funding." [Filing No. 50-18 at 2.]

That description dooms Ms. Lewis's argument that INDOT did not sincerely believe she was falling short of its expectations, as demonstrated by her failure to contradict key facts about her performance.  She does not challenge the fact that at the time of her termination, she had over 400 outstanding parcels.  And she further does not challenge the fact that overcoming her backlog of parcels cost INDOT over $150,000 to rectify.  Director Geibel stated these revelations were "the eye-opening component" that informed his decision to recommend Ms. Lewis be terminated. [Filing No. 50-2 at 57.]  Ms. Lewis argues that her prior performance review exceeded expectations.  But as the Seventh Circuit has explained, the most important measure of performance is that *"at the time* of the employment action." *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005).  (emphasis in original).  Despite her performance in 2021, Ms. Lewis does not contradict the objective fact of her extensive backlog discovered by Director Geibel's investigation in 2022 nor his sincere belief that it was professionally unacceptable.

The Rehabilitation Act requires Ms. Lewis's disability to be the sole cause of her termination.  Whether under *McDonnell Douglas* or the holistic assessment of *Ortiz*, no reasonable juror could conclude that she was terminated solely because of her disability, given INDOT's sincere belief based on "the abundant evidence of [her] substandard performance." *Crain*, 63 F.4th

40

at 595.  The Court **GRANTS** the Defendants' Motion for Summary Judgment, [49], as to Ms. Lewis's claim of discrimination under the Rehabilitation Act against INDOT.

### 2.    Retaliation

For retaliation claims under the Rehabilitation Act, a plaintiff must show that (1) she engaged in protected activity, (2) her employer took an adverse action against her, and (3) a causal connection between the two.  *Anderson v. Donahoe*, 699 F.3d 989, 995 (7th Cir. 2012).  No one disputes that seeking an accommodation and complaining of disability discrimination are protected activities and that being terminated is an adverse action, so the Court proceeds to evaluate any potential causal link between Ms. Lewis's protected activities and her termination.

At the outset, the parties dispute the standard for causation.  INDOT argues that the standard of causation for Ms. Lewis's retaliation claim is "solely by reason of" causation.  [Filing No. 68 at 14.]  Ms. Lewis argues that the standard of causation is "but for."  [Filing No. 62 at 22.]  Both are partially incorrect.  They conflate the standards of causation for discrimination and retaliation under the ADA and Rehabilitation Act.  Those two claims and statutory frameworks, however, are separate under the law and, while similar in other ways, have separate causation standards.

With the exception of causation, "[t]he Rehabilitation Act incorporates the standards applicable to Title I of the ADA."  *Brumfield*, 735 F.3d at 630 (citations omitted).  For claims of discrimination, under the ADA a plaintiff must show that a "genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse action."  *Hoffstead v. N.E. Illinois Regl. Commuter R.R. Corp.*, No. 23-3420, ___ F.4th___, 2025 WL 864799 at *3 (7th Cir. Mar. 20, 2025) (quoting *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017)).  The exception to the consistency between the ADA and the Rehabilitation Act is the standard of causation for claims of discrimination.  "[U]nder the Rehabilitation Act, a plaintiff must show that

. . . he suffered an adverse job action 'solely by reason of' . . . his disability. . . . The 'solely by reason of' causation standard is stricter than the causation standard in Title I of the ADA, which the Rehabilitation Act otherwise incorporates for its liability standards." *Swain*, 41 F.4th at 899 (quoting 29 U.S.C. § 794(a)) (cleaned up).

However, a claim for discrimination is different claim than retaliation. The ADA's and Rehabilitation Act's protections against discrimination are protections of otherwise "qualified individuals" with a disability, "but the retaliation provision protects individuals, period," even if the discrimination claim were meritless and even if the plaintiff were not disabled. *Morgan v. Joint Admin. Bd.*, 268 F.3d 456, 458-59 (7th Cir. 2001).

This distinction is crucial for understanding why ADA and Rehabilitation Act discrimination and retaliation claims are analyzed separately, as they address different aspects of unlawful conduct and offer varying scopes of protection. Retaliation claims do not require the individual to be qualified or even disabled. *Id.* The retaliation provision is broader and applies to individuals regardless of their disability status, as long as they have engaged in activities protected by the Rehabilitation Act. *Id.* Further, unlike under the ADA, for retaliation claims under the Rehabilitation Act, the standard for causation is more generally "a causal connection between the two," as opposed to "but for" under the ADA. *Anderson*, 699 F.3d at 995. So the Court analyzes Ms. Lewis's claims under the standard of whether there is a "causal connection between the two."

The "framework is the same for each claim" of determining "discriminatory intent" in claims of discrimination and retaliation, so the Court again proceeds directly to pretext and INDOT's legitimate employment expectations. *Brooks*, 39 F.4th at 434. As the Court has analyzed above, Ms. Lewis has not contradicted the key facts surrounding her ineffectiveness and insubordination: that she was disrespectful to colleagues and that she maintained a backlog of over

42

400 parcels costing INDOT a substantial sum of money to correct. Ms. Lewis argues that Manager Foreman was frustrated about her accommodation, but she neglects to address that Manager Foreman's real concern was the lack of transparency surrounding Ms. Lewis's work and whether working remotely impaired her performance; those concerns were vindicated upon the discovery of Ms. Lewis's extensive backlog. *Cf. Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 646 (7th Cir. 2023) (affirming summary judgment against employee working remote due to COVID-19 whose requested accommodation would have prevented her from "performing tasks essential to her job rather than helped her to accomplish them"). Manager Foreman explained that Ms. Lewis would be held to the same standard of performance as if she were any other in-person employee, and applying scrutiny commensurate to the difficulty of monitoring remote work is within the lawful legitimate interests of an employer. *See Huppert v. Potter*, 232 Fed. Appx. 576, 580 (7th Cir. 2007) (holding that "[i]ncreased scrutiny at work" is "not materially adverse" if it alone "resulted in no tangible job consequences"). Ms. Lewis's supervisors had concerns about her productivity that did not implicate her disability accommodation, concerns which lawfully led to her termination.

Ultimately, the Rehabilitation Act "provides no protection for a disabled worker who, like [Ms. Lewis], for reasons unrelated to [her] disability performs in such an unsatisfactory manner (whether it be for reasons of carelessness, insubordination or obstinance) that [s]he fails to keep up with the production pace and abide by the quality-control standards." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 863 (7th Cir. 2005) (analyzing accommodation under ADA). No reasonable juror could find a causal connection between Mr. Lewis's accommodation and complaints and her ultimate termination. The Court **GRANTS** Defendants' Motion for Summary Judgment, [49], as to Ms. Lewis's claim of disability retaliation in violation of the Rehabilitation Act against INDOT.

### C.    Race Discrimination and Retaliation in Violation of Title VII against INDOT

With respect to Ms. Lewis's Title VII claims based on race, INDOT first argues that Ms. Lewis did not meet its legitimate expectations, as described above, so it terminated her for her poor performance and insubordination, not because of her race. [Filing No. 53 at 9-10.] INDOT argues further that Ms. Lewis cannot show a similarly situated employee outside her protected class was treated more favorably. [Filing No. 53 at 24-25.] In an interrogatory response, INDOT asked Ms. Lewis to identify a similarly situated comparator who was treated more favorably than she was. [Filing No. 50-4 at 12.] She failed to identify any specific comparator.

Ms. Lewis responds that a reasonable jury could infer pretext for discrimination based on the timing of events given she was fired only after one of her grievances was dismissed; the lack of prior negative performance documentation; Manager Foreman's reaction to the social media post of her at the football game; the addition of new duties; and the lack of discipline before termination. [Filing No. 62 at 8-15.] She avers further that Director Geibel called her "insubordinate, contentious, and/or disrespectful" only after Lewis complained about the pay-raise disparity between her and a White employee. [Filing No. 62 at 15-16.]

INDOT replies that Ms. Lewis waived her Title VII discrimination argument because it is undeveloped. [Filing No. 68 at 9-10.] INDOT argues further that "[a]t the time of her termination, [Ms. Lewis] was two years behind on closing out parcels, had been late to multiple meetings . . . and was disrespectful towards her superiors . . . ." [Filing No. 68 at 10.] INDOT avers that Director Geibel did not have authority to approve raises, only the State Personnel Department, Ms. Lewis received a 9% increase versus a 12% increase for the White employee, a difference that is explained by the fact the White employee's salary was lower than Ms. Lewis's was before and after his raise. [Filing No. 68 at 5-6.]

### 1.    *Discrimination*

The Court begins with whether Ms. Lewis has waived her claim of racial discrimination under Title VII.  Ms. Lewis's argument almost exclusively focuses on the relationship between her alleged complaint of race discrimination regarding a pay-raise disparity and her ultimate termination.  [Filing No. 62 at 31-32.]  Nowhere does she provide meaningful analysis regarding discrimination on the basis of her race itself.  [Filing No. 62 at 31-32.]  "For purposes of Title VII, plaintiffs need to produce evidence that similarly situated non-African-American employees were treated more favorably." *Johnson v. Advoc. Health and Hosps. Corp.*, 892 F.3d 887, 896 (7th Cir. 2018).  Ms. Lewis's brief has made no effort to demonstrate more-favorable treatment to a comparator, or any comparator at all, so she has waived her claim.  *See Berkowitz,* 927 F.2d at 1384 (holding that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").[5]  Nor did she address INDOT's evidence that it was State Personnel, not INDOT, that determined salary levels.

The Court **GRANTS** the Defendants' Motion for Summary Judgment, [49], as to Ms. Lewis's claim of discrimination under Title VII against INDOT.

---

[5] Even if the Court were to charitably consider the claim on the available facts regarding Mr. Dallas Sharpe, a White employee, Ms. Lewis's claim would fail.  "Employees must be similar in all material respects, including engaging in identical or comparable misconduct, in order to reveal whether differential treatment is occurring." *Rozumalski v. W.F. Baird & Associates, Ltd.*, 937 F.3d 919, 927 (7th Cir. 2019) (citation omitted).  Ms. Lewis provides no supporting details as to whether Mr. Sharpe was a comparator in job title, job duties, or other contributing factors to the disparity.  Director Geibel explained that Mr. Sharpe's salary was "well below the salary range of [Ms. Lewis] both before and after said promotion."  [Filing No. 50-2 at 35.]  The Seventh Circuit has acknowledged that such a raise disparity can be legitimate "[w]hen . . . the pay was low" such that "a more substantial raise might be provided." *Singmuongthong v. Bowen*, 77 F.4th 503 (7th Cir. 2023).

2.    *Retaliation*

"To succeed on a Title VII retaliation claim, a plaintiff must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [employer] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Robertson v. Dept. of Health Services*, 949 F.3d 371, 378 (7th Cir. 2020) (citation omitted). Because INDOT has explained it terminated Ms. Lewis because of her insubordination and ineffectiveness, to overcome summary judgment, Ms. Lewis must again show "by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination." *Id.* No party disputes that complaining about a pay discrepancy based on race is a protected expression or that Ms. Lewis's termination was an adverse action, so the Court proceeds with analyzing a causal link.[6]

Ms. Lewis attempts to connect her complaint to Director Geibel and INDOT about the pay raise with her termination. Ms. Lewis ignores, though, that Director Geibel himself advocated for Ms. Lewis's promotion and pay raise in the first place, and she provides no contradiction to his testimony that the other employee's pay raise still resulted in a lower salary than Ms. Lewis's. Further, the Court notes that the record shows Ms. Lewis was promoted in March 2021. [Filing No. 50-1 at 32-33.] Ms. Lewis was terminated in December 2022. [Filing No. 50-23 at 1.] Ms. Lewis cannot reasonably maintain that Director Geibel worked for months to help her be promoted, and then after her complaining, lied in wait for over a year to strike back and fire her. *See Lesiv v. Illinois C. R. R. Co.*, 39 F.4th 903, 920 (7th Cir. 2022) (observing that "one-and-a-half-year gap was 'well beyond the time that would allow a reasonable jury to conclude that [her] termination

---

[6] The Court does not consider either of Ms. Lewis's 2022 complaints to State Personnel as protected activity in analyzing her race-based claims. Neither complaint mentioned race. [Filing No. 50-12; Filing No. 50-16 at 1.]

was causally related to [the protected activity]'") (quoting *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001)).  In any event, Ms. Lewis has not raised a material dispute about her supervisors' sincere beliefs about her insubordination and ineffectiveness, including disrespecting colleagues and allowing over 400 parcels to languish unprocessed, costing INDOT over $150,000 to rectify.

No reasonable jury could find that INDOT retaliated against Ms. Lewis because of her protected activity.  The Court **GRANTS** the Defendants' Motion for Summary Judgment, [49], as to Ms. Lewis's claim of retaliation under Title VII by INDOT.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, [49], in all respects.

Date: 4/10/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Stephanie Michelle Davis
Office of Attorney General Todd Rokita
stephanie.davis@atg.in.gov

Gustavo Angel Jimenez
INDIANA ATTORNEY GENERAL
gustavo.jimenez@atg.in.gov

Jeffrey A. Macey
Macey Swanson LLP
jmacey@maceylaw.com